UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------X

JOHN GONZALEZ,

          Petitioner,                **OPINION & ORDER**
                                                      **CV -06-6309**

v.

WILLIAM D. BROWN, SUPERINTENDENT

          Respondent
----------------------------------------X
FEUERSTEIN, J.

On November 7, 2002, a judgment of conviction was entered against *pro se* petitioner John Gonzalez (petitioner) in the Supreme Court of the State of New York, Kings County (Marrus, J.) upon a jury verdict finding him guilty of attempted robbery in the first degree (N.Y. Penal Law § 110.00/160.15(2)) and criminal possession of a weapon in the third degree (N.Y. Penal Law § 265.02(4)), and imposition of sentence. On November 20, 2006, petitioner filed a petition seeking a writ of habeas corpus pursuant to 28 U.S.C. § 2254.

For the reasons set forth herein, the petition is denied and the proceeding is dismissed.

I.     BACKGROUND

     A. Factual Background

The following facts were taken from the underlying trial transcript (T.), sentencing minutes (S.) and hearing transcript (H.):

-1-

1. <u>Suppression Hearing</u>

Petitioner moved to suppress (1) all evidence acquired as a result of a purportedly unlawful arrest; (2) all identification evidence on the basis that the show-up identification procedures used by police on May 2, 2001 were highly suggestive and improper; and (3) the statements petitioner made on May 2, 2001, on the basis that they were involuntarily made. (Resp. Ex. B, 1,( unpaginated))[1].

A hearing was held on June 24, 2002, at which Officers Joseph Myers, Lonnie Johnson, John Pacifico, and Detective Kenneth Wieber testified.

a. Testimony

On the morning of May 2, 2001, Officers Ferrer and Myers responded to a radio transmission of a robbery at a pawnshop located at 343 Broadway, Kings County. (H. 4). Upon arriving at the location the officers spoke to Mr. Alejandro Miranda (the "complainant"), who worked in the pawn shop and claimed that he had been robbed. (H. 5). Mr. Miranda described the alleged robber as an armed Hispanic man in his thirties dressed in a grey suit and carrying a green bag. (H. 5). Other witnesses told the officers that the perpetrator had ran northbound down Rodney Street. (H. 5-6). While driving on Rodney Street the officers came into contact with Ms. Darrah Cole, who informed them that she saw a man wearing a grey suit and carrying a green bag enter the basement of 306 Rodney Street and reappear a few moments later wearing a "white t-shirt and black sweat pants." (H. 6-8). Ms. Cole also informed the officers that the man

---

[1]Judge Priscilla Hall's memorandum and order regarding the August 13, evidentiary hearing is found in Respondents Exhibit B and will be cited as "(Resp. Ex. B, 1,(unpaginated))."

-2-

had headed northbound on Rodney Street. (H. 8). At the hearing, Officer Myers testified that the description transmitted over the radio was of "a male Hispanic, black sweat pants, white t-shirt, fled northbound on Rodney Street towards South 4th Street." (H. 8).

Shortly after the radio transmission, Officers Pacifico and Agate were driving Southbound on Rodney Street when they spotted a shirtless Hispanic man wearing black sweat pants and carrying a white t-shirt. (H. 192). According to Officer Pacifico,

> "He was walking towards me, on Rodney. He was walking northbound. I was traveling southbound. He was nearing the intersection of south 3rd and Rodney, and he appeared very nervous. He had a white T-shirt in his right hand. He had black sweat pants (sic) on, and they were rolled up, and he was sweating. He was breathing heavy. He just looked very nervous. He kept on just looking at my vehicle. I made eye contact with him several times."

(H. 192). Officer Pacifico identified the man he saw as petitioner. (H. 193). The officers stopped and frisked petitioner, at which time Officer Pacifico explained to petitioner that they were looking for someone and that he would need to remain there for a while. (H. 193-195). Officer Agate transmitted over the radio that they were holding a "possible" suspect at Rodney Street and South Third. (H. 195). Officers Myers and Ferrer were directed to bring the complainant to where petitioner was being held. (H. 9). Officer Myers brought the complainant to the location in an ambulance and, upon arriving, Officer Myers observed petitioner standing near Officer Pacifico unhandcuffed. (H. 10-11). Officer Myers then asked complainant to look out the window of the ambulance to see if he recognized anyone. (H. 13). Complainant then pointed to petitioner and claimed that he was the man who had attempted to rob him. (H. 13). Officer Myers advised Officer Agate of the positive identification. (H. 13).

Sergeants Johnson, Torchio and Officer Bovery also heard the transmission that stated a

"possible" suspect was being held for identification and drove Ms. Cole to where petitioner was being held. (H. 71). Without being asked, Ms. Cole spontaneously identified petitioner as the man she had seen go to the basement and change his clothes. (H. 75-76). Petitioner was taken into custody and transported to the ninetieth (90th) precinct. (H. 14).

At around 10:30 a.m., Detective Wieber advised petitioner of his Miranda rights and questioned him about the incident and the handgun that was recovered. (H. 128-135). Detective Wieber testified that neither he nor anyone else ever made any promises to petitioner, (H. 138), and that he never told petitioner that he would be facing significant jail time if he did not cooperate. (H. 173). Detective Wieber further testified that he was the only person in the interrogation room with petitioner and that he did not recall if he had knowledge of petitioner's criminal history when he questioned him. (H. 128, 1 75). Additionally, Detective Wieber testified that during the interrogation petitioner "provided me with a description of the person who sold him the gun. He informed me of how much he paid for the gun and also informed me that the person who sold it to him, told him that it jammed on every third shot." (H. 135).

### b. Hearing Court's Decision

By decision dated August 13, 2002, the hearing court concluded that the description provided to Officers Pacifico and Agate and the proximity of petitioner to the scene of the crime were sufficient to give rise to a "reasonable suspicion" on the officers part, which justified their stop of petitioner and the subsequent frisk and detention. (Resp. Ex. B, 3, (unpaginated)). Additionally, the hearing court found that the show-up identifications were conducted properly because they were done in temporal and spatial proximity to the scene of the crime and were not

"so unnecessarily suggestive" as to have violated petitioner's right to due process. (Id.). The court concluded that the People had met their burden of proving the voluntariness of petitioner's admissions, finding that (1) petitioner was in custody at the time of the statement; (2) petitioner was informed of and waived his Miranda rights; (3) petitioner's statement was responsive to an officer's inquiry; and (4) there was "nothing in the record to show any coercion, undue influence, or pressure was used by the police on the [petitioner] to cause him to make any statements." (Id.).

2. The Trial

a. The People's Case

The testimony of Officers Myers, Johnson, Pacifico, and Detective Kenneth Wieber at trial was consistent with their testimony at the suppression hearing and will, therefore, not be reiterated. (T. 405-432, 562-656, 764-924). The People presented several additional witnesses:

Complainant testified that on May 2, 2001 he was just opening the Buy and Sell, where he works, when petitioner entered the store and pointed a silver gun at him. (T. 281-282). Complainant further testified that when petitioner attempted to approach him, a struggle ensued at which time he "heard the noise of the trigger but no bullets came out." (T. 284). Complainant testified that it was during this struggle that he was able to strike petitioner on the head with the gun, knocking him down and enabling complainant to leave the Buy and Sell and lock petitioner inside the store. (T. 283-286).

Complainant further testified that he escaped to a neighboring restaurant and called the police. (T. 287). Once the police arrived, complainant discussed the incident with them and

described the perpetrator as wearing a "gray suit" and being "about five-four, five-five in height." (T. 289). Additionally, complainant testified that after receiving medical attention for the injuries he sustained, he rode with the police in an ambulance to where a suspect was being held, at which point he recognized petitioner as the person who attempted to rob him. (T. 291-292).

Ms. Cole testified that as she was arriving at her workplace located at 306 Rodney Street, she observed a "Latino" man with a bloody face wearing a gray suit and one shoe, carrying a gym bag and running down the street. (T. 365). Ms. Cole identified the man she observed as petitioner. (T. 365). Ms. Cole further testified that she observed petitioner enter the basement area of 306 Rodney Street for "maybe a minute" and reappear "wearing like black shorts. It was either shorts or sweat pants (sic) upped up to his knees. They were that long, I remember. And a white T-shirt." (T. 367, 369). Ms. Cole testified that petitioner then "continued down Rodney Street away from Broadway in the direction of South 5th." (T. 370). Ms. Cole further testified that as she was entering her workplace she saw a group of police officers running down the street and that she flagged down one of the officers and described what she had seen to him. (T. 371). She testified that "I saw a Latino man. That he went downstairs into – I showed him where he went into the basement entranceway. That he changed his clothes. And I told him what he was wearing when he left." (T. 371). Ms. Cole additionally testified that she accompanied the police to South Third and Rodney Streets and identified the man who went into the basement area as petitioner. (T. 372).

b. <u>The Defense</u>

Petitioner testified in his own defense. He testified that he was a repeat customer of the

Buy and Sell pawn shop and that on April 30, 2001, he and the complainant argued about a price quote for charms petitioner was attempting to pawn. (T. 957-960).

Petitioner testified that on May 1, 2001, he visited the Buy and Sell in an attempt to pay for a VCR he had previously pawned but the store was closed. (T. 960). According to petitioner, he was upset because it was the last day he could pay for the VCR before if became the property of the store. (T. 960). Petitioner further testified that on May 2, 2001, the day of the alleged robbery, he arrived at the Buy and Sell at approximately 9:05 a.m. and was admitted by complainant. (T. 960-961). Petitioner further testified that the complainant refused his payment for the VCR, which resulted in an argument. (Tr. 962-963). Petitioner testified that the complainant came out from behind the store's partition and "physically confronted" him in the front of the store. (T. 964). According to petitioner, the complainant began choking him and hit him on the head with an object, rendering petitioner unconscious. (T. 969). Petitioner testified that when he awoke the complainant gone and the front door was locked and he could not get out. (T. 969-971). Petitioner testified that he found a gun in the store and, in an attempt to escape, fired five shots at the door with the gun, but the gun jammed after the first shot. (T. 972).

Petitioner testified that upon leaving the Buy and Sell he ran into a "cubby hole" at 306 Broadway and removed the suit he was wearing, which left him wearing swimming trunks and a white t-shirt that he had been wearing underneath the suit. (973-974). He began running but was stopped by the police. (T. 973-974). Petitioner testified that shortly thereafter he was placed under arrest, put in a police car and taken to 306 Rodney Street, then to the Buy and Sell at 343 Broadway, (T. 975-977), and then to the ninetieth (90th) precinct where he was placed in an interrogation room. (T. 977).

Petitioner testified that while in the interrogation room Detective Wieber read him his Miranda rights, asked him for a statement and spoke to him about the incident at the Buy and Sell. (T. 977-978). Specifically, petitioner testified that he did not tell Detective Wieber that he brought the gun to the Buy and Sell and intended to use it to scare the complainant. (T. 978). Petitioner further testified that Detective Wieber told him he was "facing a lot of time" and that if petitioner "can give him information about drugs or guns in the neighborhood that he would be able to talk to the D.A. and I would be out in three weeks." (T. 979).

On cross-examination, petitioner testified that he did not tell Detective Wieber he purchased a gun, but rather told him of someone who sold guns and drugs in the building where he lived. (T. 1025).

### 3. Verdict and Sentence

The jury found petitioner guilty of attempted robbery in the first degree and criminal possession of a weapon in the third degree. (T. 1158). On November 7, 2002, petitioner was adjudicated a persistent violent felony offender and sentenced to concurrent indeterminate terms of imprisonment of twenty (20) years to life. (S. 8). The trial judge indicated that he believed petitioner had committed perjury when he testified at trial and recognized petitioner's extensive criminal record. (S. 7).

### 4. Procedural History

Petitioner appealed the judgment of conviction to the Supreme Court of the State of New York Appellate Division, Second Judicial Department on the grounds, *inter alia*, that the

statements he made to law enforcement officers should have been suppressed as the fruit of an unlawful seizure. On December 13, 2004, the Appellate Division, Second Department affirmed the judgement of conviction finding that "the initial stop of the [petitioner] was proper based upon reasonable suspicion that the [petitioner] was the perpetrator of the robbery, derived from descriptions provided by named citizens and the [petitioner's] own conduct... Thereafter the [petitioner] was properly placed under arrest based on the complainant's identification of him." People v. Gonzalez, 13 A.D.3d 465, 466, 785 N.Y.S.2d 751 (2nd Dept. 2004). On March 14, 2005, the New York Court of Appeals denied leave to appeal the order of the Appellate Division. People v. Gonzalez, 4 N.Y.3d 831, 796 N.Y.S.2d 586, 829 N.E.2d 679 (2005).

On March 9, 2006 petitioner filed an application for a writ of error coram nobis in the Appellate Division, Second Department to vacate his conviction on the ground of ineffective assistance of appellate counsel. The Appellate Division denied the application, finding that petitioner had "failed to establish that he was denied the effective assistance of appellate counsel." People v. Gonzalez, 13 A.D.3d 577, 817 N.Y.S.2d 533 (2nd Dept. 2006). On September 14, 2006, the New York Court of Appeals denied petitioner leave to appeal the order denying his application for writ of coram nobis. People v. Gonzalez, 7 N.Y.3d 848, 823 N.Y.S.2d 777, 857 N.E.2d 72 (2006).

On November 20, 2006, petitioner filed a petition for a federal writ of habeas corpus alleging: (1) that his admissions to Detective Wieber should have been suppressed; and (2) that his appellate counsel was ineffective for failing to raise the following issues: (a) that his statements to the police were not voluntary; (b) ineffectiveness of trial counsel; and (c) that the hearing court improperly deprived him of the opportunity to call Detective Soto as a witness

regarding the manner in which he had been interrogated.

II. DISCUSSION

   A. The AEDPA

      1. Exhaustion

The Anti-Terrorism and Effective Death Penalty Act (AEDPA), 28 U.S.C. § 2254, governs applications of incarcerated state court defendants seeking federal habeas corpus relief. The AEDPA requires that prior to bringing a petition for habeas corpus relief in federal court, a petitioner must "exhaust the remedies available in State court or demonstrate that 'there is an absence of available state corrective process [or] [that] circumstances exist that render such process ineffective to protect the rights of the [petitioner].'" Fama v. Commissioner of Correctional Services, 235 F.3d 804, 808 (2nd Cir. 2000)(citation omitted). Petitioner is required to "fairly present" both the factual and legal premises of his federal claim to the highest state court. Baldwin v. Reese, 541 U.S. 27, 124, S. Ct. 1347, 158 L.Ed. 2d 64 (2004); see also McKinney v. Artuz, 326 F.3d 87, 96 (2nd Cir. 2003). This requirement mandates that a petitioner "set forth in state court all of the essential factual allegations asserted in his federal petition; if material factual allegations were omitted, the state court has not had a fair opportunity to rule on the claim." Dorsey v. Kelly, 112 F.3d 50, 52 (2nd Cir. 1997)(quoting Daye v. Attorney General of State of New York, 696 F.2d 186, 191 (2nd Cir. 1982)).

It is undisputed that petitioner has exhausted all of his habeas claims in state court.

      2. Standard of Review

Pursuant to 28 U.S.C. § 2254(d) an application for a writ of habeas corpus that has met the procedural prerequisites

> shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless that adjudication of the claim—
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal Law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

§ 2254(d). "An 'adjudication on the merits is one that '(1) disposes of the claim on the merits, and (2) reduces its disposition to judgment.'" Bell v. Miller, 500 F.3d, 155 (2nd Cir. 2007) (citing Sellan v. Kuhlman, 261 F.3d 303, 312 (2nd Cir. 2001)).

Once claims have been adjudicated on the merits, a federal habeas court is permitted to grant the writ if, "the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." Williams v. Taylor, 529 U.S. 362 412, 120 S.Ct. 1495, 145 L.Ed.2d 389 (2000); 28 U.S.C. § 2254(d)(1). Alternatively, a federal habeas court may grant the writ if the "state court identifies the correct governing legal principle from [the Supreme] court's decisions but unreasonably applies that principle to the facts of [a] prisoner's case." Williams, 529 U.S. at 413, 120 S.Ct. 1495; 28 U.S.C. § 2254(d)(1). A federal court may not grant a habeas writ solely because the it concludes independently that the state-court decision applied federal law incorrectly, it must also be an "unreasonable" application. Williams, 529 U.S. at 411, 120 S.Ct. 1495; Gilchrist v. O'Keefe, 260 F.3d 87, 93 (2nd Cir. 2001). Under the AEDPA, determination of factual issues made by a state court "shall be presumed to be correct," and the applicant "shall have the burden of rebutting the presumption of

correctness by clear and convincing evidence." 28 U.S.C. §2254(e)(1).

B. "Reasonable Suspicion" Claim

In Stone v. Powell, 428 U.S. 465, 494, 96 S.Ct. 3037, 49 L.Ed.2d 1067 (1976), the Supreme Court held that "where the state has provided an opportunity for full and fair litigation of a Fourth Amendment claim, a state prisoner may not be granted federal habeas corpus relief on the ground that evidence obtained in an unconstitutional search or seizure was introduced at his trial." Under Stone, Fourth Amendment violations are generally not cognizable in federal habeas, *unless* the state has failed to provide the habeas petitioner "an opportunity for full and fair litigation of a Fourth Amendment claim." Wallace v. Kato, 127 S.Ct. 1091, 1099, 166 L.Ed.2d 973 (2007). Stone applies to all Fourth Amendment claims regardless of the nature of the evidence sought to be suppressed. Cardwell v. Taylor, 461 U.S. 571, 103 S.Ct. 2015, 76 L.Ed.2d 33 (1983).

There are two situations in which a defendant is not provided a full and fair opportunity to litigate his or her Fourth Amendment claims and, thus, can maintain a Fourth Amendment claim on habeas review: "(a) if the state has provided no corrective procedures at all to redress the alleged fourth amendment violations; or (b) if the state has provided a corrective mechanism, but the defendant was precluded from using that mechanism because of an unconscionable breakdown in the underlying process." Capellan v. Riley, 975 F.2d 67, 70 (2nd Cir. 1992).

Petitioner was provided an opportunity to redress his alleged Fourth Amendment violations by way of the pre-trial suppression hearing held on June 24, 2002. Upon the denial of his motion to suppress, petitioner was further afforded the opportunity to appeal that decision to

the Appellate Division, Second Department, which also rejected petitioner's claim. The New York State Court of Appeals subsequently denied petitioner leave to appeal to that court, finding that there was no question of law that required review. Since petitioner has not shown a lack of state corrective procedures or a breakdown in the underlying process, his Fourth Amendment claim is barred from federal habeas review under Stone.

C. Ineffective Assistance of Appellate Counsel

In order to prevail on a Sixth Amendment claim, a petitioner must prove that counsel's representation "fell below an objective standard of reasonableness" measured under "prevailing professional norms," and that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceedings would have been different." Strickland v. Washington, 466 U.S. 668, 694, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). The Strickland test applies to appellate as well as trial counsel. See, e.g., Smith v. Robbins, 528 U.S. 259, 285 120 S.Ct. 746, 145 L.Ed.2d 756 (2000). A petitioner alleging ineffective assistance of appellate counsel must prove both: (1) that it was objectively unreasonable for appellate counsel to fail to raise a particular issue on appeal, and (2) that absent appellate counsel's deficient performance, there was a reasonable probability that petitioner's appeal would have been successful. See, e.g., Smith, 528 U.S. at 285, 120 S.Ct. at 764; Aparicio v. Artuz, 269 F.3d 78, 95 (2d Cir. 2001).

Petitioner presented his claims of ineffective assistance of appellate counsel to the Appellate Division on his petition for a writ of error coram nobis and the Appellate Division found that his appellate counsel was not ineffective. Gonzalez, 13 A.D.3d 465, N.Y.S.2d 751. The Appellate Division's decision is not contrary to federal law, nor did it involve an

unreasonable application of Supreme Court precedent. Effective assistance of counsel is "strongly presumed," and rebutted only by a showing that "in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance." Strickland, 466 U.S. at 690, 104 S.Ct. 2052; see also Clark v. Stinson, 214 F.3d 315, 322 (2nd Cir. 2000). A petitioner may not rebut this presumption by simply arguing that appellate counsel's decision to raise certain issues and not others constitutes ineffectiveness, see Strickland, 466 U.S. at 689, 104 S.Ct. 2052; Ford v. Hoke, CV-91-4093, 1994 WL 594283 (E.D.N.Y. Oct. 25, 1994), aff'd 122 F.3d 1056 (2nd Cir. 1995), and appellate counsel is not required to "press nonfrivolous points," even if requested by client, "if counsel, as a matter of professional judgment, decided not to present those points," Jones v. Barnes, 463 U.S. 745, 751, 103 S.Ct. 3308, 77 L.Ed.2d 987 (1983).

Appellate counsel's decision to raise only a Fourth Amendment claim that evidence should have been suppressed as fruit of an illegal seizure on appeal was not deficient, but a tactical decision to pursue the strongest claim. With respect to petitioner's claim that his appellate counsel was ineffective for failing to raise the involuntariness of petitioner's custodial statements, his appellate counsel explained in his affirmation in response to petitioner's error coram nobis petition, (Exhibit I), that there was insufficient evidence in the record to discredit Detective Wieber's testimony that petitioner's statements were voluntarily made. (Id. at pp. 6-7). With respect to petitioner's claim that his appellate counsel was ineffective for failing to raise the issue of the effective assistance of trial counsel, his appellate counsel explained that that claim was based on matters dehors the record which could not have been raised on direct appeal. (Id. at p. 7). With respect to petitioner's final claim, that the hearing court erred in refusing to allow

Detective Soto to testify regarding the manner in which petitioner had been interrogated, appellate counsel explained that he deemed that claim to be untenable because there was no indication in the record that Detective Soto had relevant information. (Id. at p. 7). Since appellate counsel's failure to raise the preceding issues was a matter of professional judgment, his representation of petitioner was not ineffective.

Moreover, petitioner fails to point to any unprofessional errors in the appellate brief or argument, see Smith v. Robbins, 528 U.S. 259, 288, 120 S.Ct. 746, 145 L.Ed.2d 750 (2000); Strickland, 466 U.S. 668, 104 S.Ct. 2052; Jones, 463 U.S. 745, 103 S.Ct. 3308 (1983). Accordingly, petitioner's claim of ineffective assistance of appellate counsel is without merit.

## III. CONCLUSION

The petition for a writ of habeas corpus is denied in its entirety and the proceeding is dismissed. Since petitioner failed to make a substantial showing of a denial of a constitutional right, a certificate of appealability will not issue. 28 U.S.C. §2253; see also Miller-El v. Cockrell, 537 U.S. 322, 336, 123 S.Ct. 1029, 154 L.Ed.2d 931 (2003); Kellogg v. Strack, 269 F.3d 100, 102 (2d Cir. 2001). Petitioner has a right to seek a certificate of appealability from the Court of Appeals for the Second Circuit. See, 28 U.S.C. § 2253. The Clerk of the Court is directed to close this case.

SO ORDERED

/s/ 
SANDRA J. FEUERSTEIN
United States District Judge

Dated: September 9, 2008
Central Islip, New York